[No. F026669. Fifth Dist. May 9, 1997.]

In re LORENZO C., a Person Coming Under the Juvenile Court Law.
KERN COUNTY DEPARTMENT OF HUMAN SERVICES, Plaintiff and
Respondent, v.
DEON C., Defendant and Appellant.

**COUNSEL**

Janet H. Saalfield, under appointment by the Court of Appeal, for Defendant and Appellant.

B. C. Barmann, County Counsel, and Daniel R. Maher, Deputy County Counsel, for Plaintiff and Respondent.

**OPINION**

**DIBIASO, J.**—Deon C. appeals from the order terminating his parental rights (Welf. & Inst. Code, § 366.26) to his son, Lorenzo C.[1] We will affirm. We hold in part that a social service agency has no burden to acquire and introduce at the permanency planning hearing evidence specifically directed to the issue of whether the minor would benefit from continued contact with a parent. (§ 366.26, subd. (c)(1)(A).)[2]

### STATEMENT OF CASE AND FACTS

In August 1994, the Kern County Superior Court, sitting as the juvenile court, adjudged Lorenzo C., born April 7, 1994, a dependent under section 360, subdivision (c), and removed the infant from his parents' physical custody. At birth, Lorenzo tested positive for cocaine and, thereafter, his mother had no contact with him. The father suffered from alcohol abuse to such a degree that he was periodically incapable of providing the infant with adequate care.

---

[1] All statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

[2] Section 366.26, subdivision (c)(1)(A), provides in relevant part that the juvenile court may refuse to terminate parental rights if "[t]he court finds that termination would be detrimental to the minor" because "the parents or guardians have maintained regular visitation and contact with the minor and the minor would benefit from continuing the relationship."

At a January 30, 1995, review hearing, the court ordered Lorenzo returned to his father's care, with the provision of family maintenance services. The father had completed a parenting skills class, participated in an alcohol recovery program, and commenced counseling. It was undisputed that the father showed genuine concern for his son.

Lorenzo remained with his father until January 1996, when the Kern County Department of Human Services (the department) removed the child. According to a section 387 supplemental petition filed by the department, the father had not complied with the family maintenance plan, continued to abuse alcohol, and also abused narcotic substances. In particular, the father stopped attending counseling in February 1995 and, though he subsequently enrolled in two other programs, he completed neither—one expelled him and the other discharged him for noncompliance. He also failed to drug test on four occasions, tested positive three times for controlled substances, and admitted the daily use of alcohol.

Despite the father's problems, Lorenzo received good care. The father sheltered Lorenzo from the alcohol and drug abuse by relying on a close family friend, Meallen C., to care for the child.[3] After periodically staying with Meallen C. in 1995, the father and son moved in with her and her husband in November of that year.

On February 15, 1996, the court sustained the supplemental petition, removed Lorenzo from his father's physical custody, terminated family maintenance services and set the matter for permanency planning. Lorenzo remained in the care of Meallen C. and her husband as foster parents.

The court conducted a permanency planning hearing (section 366.26 hearing) in July 1996. According to the report prepared by the social worker for the hearing, the father had been arrested in late January 1996 and since that date had been incarcerated in a county facility. The father had had no contact with Lorenzo after approximately March 1, 1996. The social worker also reported that during the one-year period when the father had physical custody of Lorenzo, there was "some evidence of bonding" between the two. However, Lorenzo appeared to have a much stronger bond with his foster parents. The department recommended that the court free Lorenzo for adoption by the foster parents.

The juvenile court admitted the social worker's report into evidence at the section 366.26 hearing. Counsel for the father did not object to the admission

---

[3]The department placed Lorenzo with Meallen C. between late July 1994 and January 1995. It initially believed Meallen C. was the child's paternal great aunt. She was a licensed foster parent.

of the report nor did he introduce any evidence on the father's behalf. The father formally waived his right to be present and did not personally attend the hearing.

At the section 366.26 hearing, it was uncontested that Lorenzo was adoptable, but counsel for the father urged the court to select guardianship as the permanent plan. Counsel relied on the father-son contacts and the "evidence" of bonding between the two reported by the social worker. He also theorized that "there doesn't appear to be any threat to the minor's sense of security if his relationship with his natural father is protected." The court disagreed and terminated the rights of the father as well as those of the mother.

DISCUSSION

### I. *Visitation*

■ The father first contends the juvenile court failed to "review the record of visitation" between him and Lorenzo before terminating his parental rights. He relies upon the statement in *In re Monica C.* (1995) 31 Cal.App.4th 296, 307 [36 Cal.Rptr.2d 910], that "section 366.26, subdivision (c)(1)(A), contemplates the court will review the record of visitation before terminating parental rights." According to the father, the trial court did not engage in such a review, and could not have done so had it tried, because the social worker's report for the section 366.26 hearing did not "describe the actual amount of time" the father spent with Lorenzo since the commencement of the dependency proceedings.

We find the department's reports were adequate. First, *Monica C.* does not support a conclusion that the department's section 366.26 report was deficient because it did not break down by hours and minutes the time the father visited with Lorenzo. At issue in *Monica C.* was whether the juvenile court at a 12-month review hearing (§ 366.21, subd. (f)) erred in holding that reasonable services had been extended where the reunification plan did not provide for any visitation whatsoever between parent and child. (*In re Monica C., supra,* 31 Cal.App.4th at pp. 306, 310.) The statement by the court about section 366.26, subdivision (c)(1)(A), did nothing more than provide some secondary support for the court's ultimate conclusion that a reunification plan which did not include a visitation element was inadequate under the circumstances. At best the remark was dictum. (*In re Monica C., supra,* 31 Cal.App.4th at p. 307.)

Second, we do not find the social worker's report to have been insufficient with respect to its references to past visitation. When the court orders a

section 366.26 hearing, it also directs the agency supervising the dependent child to prepare an assessment which will include, in relevant part, a review of the amount of and nature of any contact between the minor and his or her parents since the time of placement. (§§ 366.21, subd. (i)(2), 366.22, subd. (b)(2).) There is no requirement in this statute that the social worker describe the "actual amount" of time, by minutes, hours or other measure, that a parent and child have spent together during the dependency.

Here, the social worker's report detailed the following contacts between Lorenzo and his parents.

"From the time the minor was placed into protective custody on July 8, 1994 until November 21, 1994, there were no reported visits between the minor and his parents. The minor's father was in custody until sometime in October of 1994. The minor's mother's whereabouts remained unknown during this entire time. According to case records, the father of the minor visited with the minor on a regular basis, sometimes daily, from November 1994 until January of 1995. These visits were supervised by the caretakers. There is no information available as to the quality of these visits or the exact number of visits that took place during this time.

"On January 30, 1995, the court ordered the minor be placed with his father and Family Maintenance Services were provided. The case remained in the Family Maintenance Program for approximately one year. . . .

"During the time that Family Maintenance Services were offered, the father and the minor lived off and on in the home of the 'aunt and uncle' who had been the caretakers during the Family Reunification period. They also lived in at least two different motels during this time, as well as a number of apartments. There did appear to be some evidence of bonding between the father and the minor during the time that Family Maintenance Services were offered.

"On January 22, 1996, the minor was again placed into protective custody and placement [sic] with the caretaker 'aunt and uncle.' . . . Shortly after the removal of the minor from the father's home in January 1996, the. father was arrested and has been incarcerated in the Kern County Sheriff's Lerdo Facility ever since. There has been no contact between the minor and his father since approximately March 1, 1996."

This summary well satisfies the statutory command that the social worker describe the amount and nature of any parent-child contact.

Third, the precise amount of time the father and Lorenzo spent together was not of consequence to the juvenile court's determination of the issue

before it. It was undisputed that the father had physical custody of Lorenzo between January 1995 and January 1996, but had no contact with the child after March 1, 1996. Given Lorenzo's young age, the court could not have made the finding that some bond existed between the child and his father in the absence of evidence of regular contact between the two. The proper issue before the court, however, was whether the minor would benefit from continuing in a relationship with his father. (§ 366.26, subd. (c)(1)(A).) A breakdown of the actual amount of time that the father spent with Lorenzo during the course of the dependency would not have helped resolve this question.

## II. Bonding Study

■ This note appeared in the social worker's report for the section 366.26 hearing: "A request has been made that the caretakers schedule a psychological evaluation for the minor. At the writing of this report, the psychological evaluation has not been performed. . . ."

Seizing upon this comment and assuming the "psychological evaluation" would have included a bonding assessment, the father claims the juvenile court abused its discretion by not ordering the completion of a bonding study before terminating his parental rights.[4] The father takes the position such an assessment would have provided information which would have compelled the juvenile court to find that termination of parental rights would be detrimental to Lorenzo.

The father's argument is neither cognizable nor meritorious. First, we agree with the department that the father waived the issue for purposes of appeal by not asking the juvenile court to order a bonding study. ■ Many dependency cases have held that a parent's failure to object or raise certain issues in the juvenile court prevents the parent from presenting the issue to the appellate court. (See *In re Aaron B.* (1996) 46 Cal.App.4th 843 [54 Cal.Rptr.2d 27] [failure to object to adequacy of adoption assessment]; *In re Kevin S.* (1996) 41 Cal.App.4th 882, 885-886 [48 Cal.Rptr.2d 763] [failure to challenge court's ability to set a section 366.26 hearing when it determined reasonable reunification efforts were not made]; *In re Anthony P.* (1995) 39 Cal.App.4th 635, 640-642 [46 Cal.Rptr.2d 107] [failure to request sibling visitation as part of a permanent plan]; *In re Daniel D.* (1994) 24 Cal.App.4th 1823, 1830-1831 [30 Cal.Rptr.2d 245] [failure to request alternative placement]; *In re Crystal J.* (1993) 12 Cal.App.4th 407, 411-412 [15

---

[4]There is no other reference to a psychological evaluation in the entire record. No such evaluation was ordered by the court, and none was a part of the case plan once the court set the matter for permanency planning.

Cal.Rptr.2d 613] [failure to object to adequacy of adoption assessment]; *In re Jennilee T.* (1992) 3 Cal.App.4th 212, 222 [4 Cal.Rptr.2d 101] [failure to object to qualifications of court-appointed psychologists regarding § 361.5, subd. (b)(2)]; *In re Riva M.* (1991) 235 Cal.App.3d 403, 411 [286 Cal.Rptr. 592] [failure to object to noncompliance with Indian Child Welfare Act]; *In re Daniel C. H.* (1990) 220 Cal.App.3d 814, 836 [269 Cal.Rptr. 624] [failure to object to juvenile court's amendment of pleading to conform to proof].) As some of these courts have noted, any other rule would permit a party to trifle with the courts. The party could deliberately stand by in silence and thereby permit the proceedings to reach a conclusion in which the party could acquiesce if favorable and avoid if unfavorable. (*In re Riva M., supra,* 235 Cal.App.3d at p. 412, citing *In re Christian J.* (1984) 155 Cal.App.3d 276, 279 [202 Cal.Rptr. 54].)

To date, no published opinions address the effect of a parent's failure to request a bonding study for purposes of a section 366.26 hearing. Many of the decisions we listed above dealt with the lack of an objection to the admissibility of allegedly improper or inadequate evidence. (See Evid. Code, § 353.) Some, however, did pertain to a party's failure to ask the court to exercise its discretion. (See *In re Anthony P., supra,* 39 Cal.App.4th at pp. 640-642 [failure to request sibling visitation as part of a permanent plan]; *In re Daniel D., supra,* 24 Cal.App.4th at pp. 1830-1831 [failure to request alternative placement]; *In re Daniel C. H., supra,* 220 Cal.App.3d at p. 836 [failure to object to juvenile court's amendment of pleading to conform to proof].) These courts have taken the position that if the law does not require the juvenile court to act in a certain way, the parent bears the responsibility to care for his or her own interests by asking the court to exercise its discretion in a manner favorable to the parent. In such circumstances, the courts have not permitted the silent parent to argue that the juvenile court erred in not being psychic. We agree with these decisions.

 Here, the father did not look after his own legal rights by asking the juvenile court to exercise its discretion in favor of ordering a bonding study. (See *Sommer* v. *Martin* (1921) 55 Cal.App. 603, 610 [204 P. 33].) He has therefore waived for appellate purposes his contention that the juvenile court should have required a bonding study before terminating his parental rights.

Alternatively, even if the father preserved the argument, it fails on its merits. There is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to a termination order. In addition, although the preservation of a minor's family ties is one of the goals of the dependency laws, it is of critical importance only at the point in the proceeding when the court removes a dependent child from parental

custody (§ 202, subd. (a)).[5] Family preservation ceases to be of overriding concern if a dependent child cannot be safely returned to parental custody and the juvenile court terminates reunification services. Then, the focus shifts from the parent's interest in reunification to the child's interest in permanency and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309 [19 Cal.Rptr.2d 544, 851 P.2d 826].) This appeal involves issues which arose well after the juvenile court removed Lorenzo from his father's custody and terminated reunification services.

Neither of the cases mentioned by the father, *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1068 [24 Cal.Rptr.2d 654] and *In re Jasmon O.* (1994) 8 Cal.4th 398, 426-427 [33 Cal.Rptr.2d 85, 878 P.2d 1297], aids his argument. *Robert L.* was an appeal from a disposition order which removed the minor from parental custody. (*In re Robert L., supra,* 21 Cal.App.4th at p. 1060.) Unlike the present case, *Robert L.* did not involve the termination of parental rights. *Jasmon O.* is equally inapplicable because it dealt with termination under former Civil Code section 232. Terminations of parental rights under this superseded statute bear little resemblance to terminations under currently applicable section 366.26. (Compare section 366.26 with former Civ. Code, section 232.) The Legislature intentionally designed the present day section 366.26 hearing to allow the trial court to avoid reconsidering issues previously decided in the dependency proccedings in order to expedite the permanent placement of the child. (*Cynthia D.* v. *Superior Court* (1993) 5 Cal.4th 242, 246-250 [19 Cal.Rptr.2d 698, 851 P.2d 1307].)

We are also unmoved by the assertion, founded upon a statement in *In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1165 [53 Cal.Rptr.2d 93], that the court at the section 366.26 hearing should have ordered a bonding study as "a final check to ensure termination of parental rights is in the best interests of the minor and is the least detrimental alternative." This quoted language from *Tabatha G.* is taken out of context by the father. The issue in *Tabatha G.* was whether the reference to "the interests of the minor" in section 366.26, subdivision (c)(4), amounted in practical effect to a fifth exception to the statutory rule that adoption is the preferred permanent plan.[6] The appellate court determined that the "interests of the minor" was not a factor

---

[5]Section 202, subdivision (a), states in relevant part that the dependency statutes are intended "to preserve and strengthen the minor's family ties whenever possible, *removing the minor from the custody of his or her parents only when necessary* for his or her welfare or for the safety and protection of the public. *When removal of a minor is determined by the juvenile court to be necessary,* reunification of the minor with his or her family shall be a primary objective." (Italics added.)

[6]Section 366.26, subdivision (c)(4), provides in relevant part: "If the court finds that adoption of the minor or termination of parental rights is not in *the interests of the minor,* or that one of the conditions in subparagraph (A), (B), (C), or (D) of paragraph (1) or in

separate and distinct from the four express exceptions set out in the statute. (*In re Tabatha G., supra*, 45 Cal.App.4th at p. 1165.) The court then said: "The four specified exceptions to adoption provided in section 366.26, subdivision (c)(1) are a final check to ensure termination of parental rights is in the best interests of the minor and is the least detrimental alternative." (*Ibid.*)

The *Tabatha G.* court did not hold, or even hint, that a juvenile court at a section 366.26 hearing must order a bonding study to ensure that termination is in the dependent child's best interests.

Finally, it is difficult to envision how the court abused its discretion by not ordering a bonding study in this case. The applicable standard of review is whether, under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study. (*In re Robert L., supra*, 21 Cal.App.4th at p. 1067.) Here, the undisputed evidence was that there was some bonding between the father and Lorenzo but that the child had a stronger bond with the foster parents.[7] Also, the child was only two years old at the time of the section 366.26 hearing and had had no contact with his father during the preceding five months. Under these circumstances, it is unlikely that a bonding study would have been useful to the juvenile court. The juvenile court did not err in not ordering a bonding study.

III. *Benefit to the Child*

█ The father claims the court erred by basing its termination order on a comparison of the degree of bonding between Lorenzo and his father on the one hand and between Lorenzo and his foster parents on the other.

It was undisputed that Lorenzo was adoptable. In addition, the court had previously determined that Lorenzo could not be returned to his father's custody. Thus, the preferred permanent plan for Lorenzo was adoption (*In re Tabatha G., supra*, 45 Cal.App.4th at p. 1164; *In re Edward R.* (1993) 12 Cal.App.4th 116, 122 [15 Cal.Rptr.2d 308]), and the law required the court to terminate the father's rights unless it was able to find that Lorenzo would

---

paragraph (2) applies, the court shall either order that the present caretakers or other appropriate persons shall become legal guardians of the minor or order that the minor remain in long-term foster care." (Italics added.)

[7]The father's charge that the evidence of the child's stronger bond with the foster parents was nothing more than the social worker's unsupported conclusion is beside the point. Because the father did not lodge any objection to this evidence when it was offered in the juvenile court, he has waived for purposes of appeal the claim that it was improperly admitted. (Evid. Code, § 353.)

benefit from continuing the parent-child relationship. (§ 366.26, subd. (c)(1)(A).)[8]

The existence of interaction between natural parent and child will always confer some incidental benefit to the child. Nevertheless, the exception in section 366.26, subdivision (c)(1)(A), requires that the parent-child relationship promote the well-being of the child to such a degree that it outweighs the well-being the child would gain in a permanent home with new, adoptive parents. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [32 Cal.Rptr.2d 535].) A juvenile court must therefore: "balance[] the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Id.* at p. 575.)

In the context of these guidelines, the juvenile court in this case framed the issue as being: "whether the bond between the father and the child [was] strong enough for the child to overcome the statutory preference for adoption . . . ," and "consider[ed] the strength of the bond with the proposed adoptive parent as part of that equation [whether the statutory preference for adoption was overcome] when there is a proposed adoptive parent."

In effect, the juvenile court correctly measured the specific circumstances before it against the general principles articulated in *Autumn H.* Having done so, the court concluded that "the preference for adoption [was] not overcome by the extent of the bond the evidence indicates exists between the father and the son in this case." The overriding concern at the section 366.26 hearing was the provision of a stable, permanent home in which Lorenzo could develop a lasting emotional attachment with his caretakers. (*In re Jasmon O., supra,* 8 Cal.4th at p. 421.) In our view, the juvenile court did not abuse its discretion by considering the child's bond with his prospective adoptive parents or comparing this bond with the bonding between Lorenzo and his father.

Moreover, the father overstates the influence upon the court's decision of Lorenzo's bond with his fost-adopt parents. Here, the record was void of any evidence that Lorenzo would be greatly harmed by a termination order. In fact, there was no evidence that he would benefit from a continuing relationship with his father. All the record showed was that there was "some evidence of bonding" between the father and son. Under these circumstances, the juvenile court could not reasonably have made any decision other than to terminate the father's rights.

---

[8]None of the other three exceptions to adoption in section 366.26, subdivision (c)(1), are relevant to this case.

We also reject the father's ancillary claim that the social worker's report was legally deficient because it did not address "what the real strength and quality of the bonding with his *father* actually was and whether the loss of *that* relationship would be a substantial loss for Lorenzo." The department had no such duty under any of the relevant statutes. As we explained earlier, the law requires the agency supervising the dependent child to prepare an assessment for the section 366.26 hearing which includes, in relevant part, a "review" of the amount of and nature of any contact between the minor and his or her parents since the time of placement. (§§ 366.21, subd. (i)(2), 366.22, subd. (b)(2).) These statutes do not require that the department address "the real strength and quality of the [parent-child] bonding" and whether termination will be a "substantial loss" for the child.

## IV. *Evidentiary Burden*

■ Two assumptions underlie most of the father's arguments on appeal: (1) the department bore the burden of finding and presenting at the section 366.26 hearing evidence pertaining to the question whether the exception to termination described in section 366.26, subdivision (c)(1)(A), applied; and (2) the juvenile court was required to take affirmative steps to insure that the department satisfied this obligation.

Neither of these suppositions is correct. Several appellate courts have held that if there is clear and convincing proof of adoptability, the juvenile court must terminate parental rights unless *the parent* produces evidence sufficient to persuade the court that the child would benefit from continuing the parent-child relationship. (*In re Tabatha G., supra,* 45 Cal.App.4th at p. 1164; *In re Autumn H., supra,* 27 Cal.App.4th at p. 574; *In re Cristella C.* (1992) 6 Cal.App.4th 1363, 1372 [8 Cal.Rptr.2d 342]; *In re Brian R.* (1991) 2 Cal.App.4th 904, 924 [3 Cal.Rptr.2d 768].)

■ These opinions are consistent with the express language of sections 366.21 and 366.22, which impose no obligation on the agency to introduce, at the section 366.26 hearing, evidence which tends to either support or negate the possibility that the child might profit from continued contact with a parent. The agency is only required to prepare a study "regarding the likelihood that the minor will be adopted if parental rights are terminated." (§§ 366.21, subd. (i), 366.22, subd. (b).) Thus, the focus of this agency assessment is upon factors which relate to adoptability. (§§ 366.21, subd. (i)(3)-(5), 366.22, subd. (b)(3)-(5).) The law requires the agency to provide only limited information about previous parent-child contact, to wit, a

"review" of the amount and nature of any contact between the minor and his or her parents since the time of placement. (§§ 366.21, subd. (i)(1), (2), 366.22, subd. (b)(1), (2).) We impart to the word "review" its common meaning of "to survey" or "to look back on" (Webster's New Internat. Dict. (3d ed. 1961) p. 1944). (See *People* v. *Turner* (1993) 15 Cal.App.4th 1690, 1696 [19 Cal.Rptr.2d 736] [a statute should be construed in accord with the ordinary meaning of the language used]; *Educational & Recreational Services, Inc.* v. *Pasadena Unified Sch. Dist.* (1977) 65 Cal.App.3d 775, 782 [135 Cal.Rptr. 594].) We do not therefore read it as a direction to the agency to go beyond a general description of the post-placement contacts between parent and child and into a detailed evaluation about whether the continuance of the relationship manifested by such contacts would be beneficial to the child.

In addition, there is no command in section 366.26 or the adoption assessment provisions of section 366.21, subdivision (i), or section 366.22, subdivision (b), that the agency at the section 366.26 hearing produce evidence which demonstrates the minor would or would not benefit from continued parental contact. This is in contrast to subdivision (f) of section 366.21 (12-month review hearing) or subdivision (a) of section 366.22 (18-month review hearing), both of which expressly place upon the agency the burden of proving "detriment." The Legislature obviously knows how to charge the agency with an evidentiary obligation in a dependency proceeding; we presume the Legislature would have explicitly imposed upon the agency some such affirmative duty with respect to section 366.26, subdivision (c)(1)(A), if it wanted the agency to have it. (See *People* v. *Turner, supra,* 15 Cal.App.4th 1690, 1698.) ▮ Where a statute concerning one subject contains a given provision, the omission of such a provision from a similar statute concerning a related subject is significant to show that a different legislative intention existed. *(Ibid.)*

The several cases we follow are also consistent with the overall plan and purpose of the dependency laws. By the time of the section 366.26 hearing, family preservation is not an object of the statutory scheme. Family preservation is of critical importance from the time the minor is removed from parental custody (§ 202, subd. (a)) through the reunification period. However, when reunification efforts cease, the scale tips away from the parent's interest in maintaining family ties and towards the child's interest in permanence and stability. *(In re Marilyn H., supra,* 5 Cal.4th 295, 309-310.) At that point, adoption becomes the preferred permanent plan. *(In re Tabatha G., supra,* 45 Cal.App.4th at p. 1164; *In re Edward R., supra,* 12 Cal.App.4th at p. 122; § 366.26, subd. (c)(1).) Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child. *(In re*

*Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419 [35 Cal.Rptr.2d 162]; *Jones T.* v. *Superior Court* (1989) 215 Cal.App.3d 240, 251 [264 Cal.Rptr. 4].)

Furthermore, if the agency concludes the minor is adoptable and argues for termination of parental rights at a section 366.26 hearing, the agency's objective is in direct conflict with a parent who desires to avoid termination in order to maintain a link with the child. To require the agency to produce evidence about whether the child might benefit from continued parental contact would compel the agency to bring up facts not essential to its case at the section 366.26 hearing. (See Evid. Code, § 500 [a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense asserted]; 1 Witkin, Cal. Evidence (3d ed. 1986) Burden of Proof and Presumptions, § 132 et seq., p. 116 et seq.)

 On the other hand, it is reasonable to impose the burden of proof upon a parent who objects to termination based on the alleged existence of the exception identified in section 366.26, subdivision (c)(1)(A). It is the parent who is concerned with avoiding termination by establishing that a continued parent-child relationship will be of positive consequence for the child. (See Evid. Code, § 500; cf. *Norwood* v. *Judd* (1949) 93 Cal.App.2d 276, 282 [209 P.2d 24] [one who claims an exemption from a general statute has the burden of proving that he or she comes within the exemption].) To help make his or her case, the parent may need to request the court's assistance in, for example, securing the presence of witnesses at the section 366.26 hearing or ordering, for good cause shown, a bonding study. However, this dependence, faced to some greater or lesser degree by every party involved in civil or criminal litigation regardless of the allocation of the burden of proof, is no reason to saddle the department with the responsibility of searching out and offering at the section 366.26 hearing evidence relevant to the applicability of the exception.

DISPOSITION

The judgment (order terminating parental rights) is affirmed.

Martin, Acting P. J., and Stone (W. A.), J., concurred.

A petition for a rehearing was denied June 9, 1997, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 13, 1997.